**LOMEX CORPORATION, et al., Appellants,**

v.

**Neal M. McBRYDE, et al., Appellees.**

**No. 04–83–00406–CV.**

Court of Appeals of Texas, San Antonio.

July 17, 1985.

Rehearing Denied Sept. 6, 1985.

M.W. Meredith, Jr., Meredith & Donnell, Corpus Christi, for appellants.

J.G. Adami, Jr., Clyde L. Wright, Jr., Alice, for appellees.

Before ESQUIVEL, TIJERINA and DIAL, JJ.

## OPINION

DIAL, Justice.

This is an appeal from a declaratory judgment construing royalty provisions in a partition deed and a subsequent mining lease covering uranium.

The partition deed divided certain property located in Jim Wells and Duval Counties among the heirs and devisees of the deceased owner of the property. Each party to the partition deed received the exclusive executive rights for mineral leasing of their share. Each partitioned share was subject to a reservation of "the interests in the royalty from the oil, gas and other minerals in, under and that may be produced" from that portion of land in favor of all the parties to the partition deed collectively. Each partition provided for a minimum royalty to all the parties should any part be leased and developed for oil and gas and "for a royalty on other minerals mined or marketed from said land one-eighth ($\frac{1}{8}$th) either in kind or in value." The deed went on to devise a non-participating royalty of one-eighth "of all the oil, gas and other minerals in, under and that may be produced" to the parties in equal shares. The deed further provided:

... It is expressly understood that such non-participating royalty interest of $\frac{1}{8}$th shall be paid to the owners thereof in the proportions hereinbefore provided free and clear of all costs and expense except taxes.

One of the parties to the deed eventually executed a mineral lease covering some of the property in Duval County. The lease granted the right to explore and develop uranium from the property and contained the following royalty provisions:

a. For all uranium bearing ores produced from said leased premises which are saved and sold in the form of $U_3O_8$ (yellowcake) following processing or beneficiation, drying, and packaging, a royalty of seven percent of the total gross proceeds received by lessee from the sale of such $U_3O_8$ from the processing plant to the point of sale.

b. For all uranium bearing ores produced from said leased premises which are saved and sold by lessee in a form other than $U_3O_8$ (yellow-cake), a royalty of 7% of the total proceeds received from lessee from the sale of such uranium bearing ores, less any costs incurred by lessee for transportation of such uranium bearing ores from the leased premises to the point of sale.

The Lomex Corporation ultimately acquired the lease and began the development of a uranium solution mine on the property. Solution mining is a process whereby a chemical leach solution is injected into a pattern of holes that have been drilled through uranium-bearing ores underground. As the leach solution is flushed through the ore body, uranium dissolves into the solution and is brought back up to the surface through recovery holes. This solution at the surface is called "pregnant liquor" since it contains the leach solution and small dissolved amounts of uranium compounds. The pregnant liquor goes to a treatment plant where the uranium is removed from the solution in various stages of ion exchange, filtration, and precipitation. The remaining uranium is diluted and squeezed off into a slurry substance known as "yellowcake." The leach solution is then tested and chemicals added as needed, and it is pumped back into the ground to repeat the process.

To accomplish the solution mining process, Lomex erected an elaborate treatment plant at the site of the mine on the land in question.

During this development, the parties to the partition deed who were not parties to the lease or did not ratify the lease filed suit for declaratory judgment to have the court determine their royalty interest from the uranium produced. The parties who filed the suit will be referred to here as plaintiffs. Lomex and the other parties will be referred to as defendants.

The plaintiffs' contention was and is that the uranium royalty provisions in the lease violated the terms of the partition deed because the royalty from the lease was less than the minimum royalty mandated by the partition deed. The plaintiffs maintained that the royalty provision in the deed should control. They further contend that the deed would entitle them to a royalty of one-eighth or twelve and one-half percent on the gross proceeds from the sale of yellowcake to be paid free and clear of all costs except taxes.

The defendants contend that if the plaintiffs are to receive a royalty of one-eighth or twelve and one-half percent, it should be based on the pregnant liquor produced from the mine. If the royalty is to be based on the yellowcake production, then the plaintiffs should be assessed a proportional share of the cost of processing the pregnant liquor into yellowcake. Alternatively, they would agree that the plaintiffs are entitled to a royalty of seven percent of the total proceeds from the sale of yellowcake less transportation costs as provided for in the lease.

The trial judge entered judgment awarding the plaintiffs royalties of twelve and one-half percent of the gross proceeds of the sale of yellowcake free of all production costs except taxes. Comprehensive findings of fact and conclusions of law were filed.

The judge found that the common source of title of all parties in the cause to any uranium substances or the proceeds therefrom was the partition deed. The defendants do not challenge this finding. It is supported by competent evidence and is therefore binding upon this court. *Greater Beauxart Garden Municipal Utility District v. Cormier*, 596 S.W.2d 597, 600 (Tex. Civ.App.—Beaumont 1980, no writ).

The trial court concluded that the defendants were bound by and their interests were subject to and limited by the terms, provisions and restrictions of the partition deed. The defendants do not seriously challenge this conclusion, and we agree with the legal principal. *Gulf Production Co. v. Continental Oil Co.,* 139 Tex. 183, 132 S.W:2d 553, 568 (1939); *Odstrcil v. McGlaun,* 230 S.W.2d 353, 355 (Tex.Civ.App.—Eastland 1950, no writ).

Since the partition deed controls over the uranium lease, we need only construe the terms of the deed. At the time of the execution of the deed (1967) all uranium mining was done by strip mining on the surface or by excavation from an underground shaft. Solution mining was not developed in Texas until the 1970's. The parties did not specifically mention uranium in the deed, referring only to "oil, gas and other minerals." There was, of course, no mention of solution mining nor at what point in that process the royalties were to be determined. Our task is to construe conventional royalty provisions in the light of what we now know of solution mining technology. *Compare U.S. Steel Corp. v. Whitley,* 636 S.W.2d 465, 468 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.) (construing royalty payment provisions in 1969 uranium mining lease).

Defendants cite *Danciger Oil & Refineries, Inc. v. Hamill Drilling Co.,* 141 Tex. 153, 171 S.W.2d 321 (1943), and its progeny as supporting their position. In *Danciger,* the question was whether a royalty payment was to be based on the value of crude gas as mined or its value after it had been processed into other products. The provision in question retained a ¹⁄₂₄th royalty "of all the oil, gas, casing head gas, and other minerals produced, saved and marketed ... free and clear of operating expenses if, as and when produced, saved and marketed." The Texas Supreme Court held that under such a provision, the producer was not obligated to convert the gas into some other product. He was only obligated to put the gas in condition for marketing as gas. *Id.* at 157, 171 S.W.2d at 322. The court also held that "operating expenses" re-

ferred to expenses necessary in producing gas for market, not the expenses of processing gas into some other product after it had been produced in the form of gas. The royalty was held to be the value of the crude gas with no requirement that it be refined into some other commodity. *Id.*

To apply the reasoning of *Danciger* to our present case, we conclude first that the producer has no obligation to convert the uranium into some other product. He is only obligated to put it in a marketable condition. The trial court found as a fact that the first marketable ("saleable") uranium product from the mine in question was a uranium substance called yellowcake slurry. This finding is abundantly supported by the evidence and should not be disturbed on appeal. *City of Clute v. City of Lake Jackson,* 559 S.W.2d 391, 395 (Tex. Civ.App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.).

The other lesson to be learned from *Danciger* is that the royalty is to be paid out of the oil, gas or other minerals produced and not out of its value after it had been processed into some other product of a higher value. This would mean in our case, the royalty was to be based on the value of uranium produced and not some other product.

Under the solution mining process, when the uranium first comes to the surface, it is in the form of pregnant liquor. As far as mining engineering is concerned, the mining of the uranium has been completed when it has thusly been brought to the surface. On this premise, the defendants contend that the royalty should be determined at that time based on the value of the pregnant liquor.

The plaintiff's answer is that there is no known market for pregnant liquor and therefore no ascertainable value of the royalties at this stage. This contention is supported by the finding of the trial judge that the first saleable stage of the process was when the uranium was in the form of yellowcake. The plaintiffs therefore contend that the royalty should be based on the market value of yellowcake free of the expense of processing.

The simple answer is that the royalty is based on the *mineral* mined or marketed. The mineral is uranium, not pregnant liquor or yellowcake.

When the uranium from solution mines is sold, it is in the form of yellowcake, but the sale price is based on the uranium content of the yellowcake, not the quantity of the yellowcake. If metering devices were in place at the mine and could measure the quantity of uranium in the pregnant liquor, there would be nothing to prevent the parties from basing the royalty on the value of the uranium mined at that stage. The same result would be reached if they waited until the uranium was sold in the form of yellowcake because it is the uranium that is sold. The trial judge correctly based the royalty on the gross proceeds of the sale of yellowcake.

In any event, the plaintiffs are not chargeable with any mining or processing expense—be it bringing the uranium to the surface in the form of pregnant liquor or processing it to the form of yellowcake. The only expenses that are attributable to the plaintiffs are taxes.

All the points of error have been carefully considered, and none presents a reason for reversing the judgment. All points of error are overruled.

The judgment is affirmed.